1

2

3

4

5                    UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
6                          AT SEATTLE

7   CURTIS McWASHINGTON; EDWARD M.
    MESHURIS; EMILY SANCHEZ; JAMES
8   ALBRIGHT; and CORY R. CROUCHLEY,
    individually as participants in the Nordstrom
9   401(k) Plan and as representatives of all
    persons similarly situated,
10
                         Plaintiffs,              C24-1230 TSZ
11
         v.                                       ORDER
12
    NORDSTROM, INC.; BOARD OF
13  DIRECTORS OF NORDSTROM, INC.; and
    NORDSTROM 401K PLAN RETIREMENT
14  COMMITTEE,

15                       Defendants.

16        THIS MATTER comes before the Court on a motion to dismiss, docket no. 30,

17  brought by defendants Nordstrom, Inc. ("Nordstrom"), the Board of Directors of

18  Nordstrom (the "Board"), and the Nordstrom 401(k) Plan Retirement Committee (the

19  "Committee") (collectively, "Nordstrom Defendants"), and a related motion for judicial

20  notice or incorporation by reference, docket no. 32, also brought by the Nordstrom

21  Defendants.  Having reviewed all papers filed in support of, and in opposition to, the

22  motions, the Court enters the following Order.

23

ORDER - 1

**Background**

Plaintiffs Curtis McWashington, Edward Meshuris, Emily Sanchez, James Albright, and Cory Crouchley are either current or former employees of Nordstrom. Am. Compl. at ¶¶ 23–27 (docket no. 29). They now have or previously had active accounts in Nordstrom's 401(k) Plan (the "Nordstrom Plan" or "Plan"), which is a "defined contribution[1] employee pension benefit plan" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"). *Id.* at ¶¶ 16 & 23–27; *see* 29 U.S.C. §§ 1002(2)(A) & (34); *see also* 26 U.S.C. § 401(k). In this action, plaintiffs allege that the Committee breached its duty of prudence, and that Nordstrom and the Board failed to adequately monitor other fiduciaries, with respect to both (i) bundled recordkeeping and administrative ("RKA") expenses, and (ii) managed

---

[1] When establishing a retirement plan for employees, companies may elect between two models, namely (i) a defined-benefit plan, or (ii) a defined-contribution plan. *See Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020); *see also* 29 U.S.C. §§ 1002(34) & (35). A defined-benefit plan periodically provides retirees with a fixed payment regardless of how well or poorly the plan's investments perform. *Thole*, 590 U.S. at 540. In contrast, a defined-contribution plan involves individual investment accounts that are each funded by contributions drawn from the respective employees' wages, as well as any matching amounts from the employer. *See Hughes v. Nw. Univ.*, 595 U.S. 170, 173 (2022). Each participant in a defined-contribution plan may choose among the investment options in the plan's menu. *See id.* The amount of an individual's and the company's contributions, the performance of the selected investment vehicles, and the fees incurred over the course of time will affect post-retirement payout figures. *See Forman v. TriHealth, Inc.*, 40 F.4th 443, 446 (6th Cir. 2022); *see also Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 277–78 (8th Cir. 2022) ("The amount available at retirement depends on the choices that participants make: when and how much to contribute, what investments to select, and when to start withdrawing money. . . . It can also depend on how well the plan managers carry out their fiduciary duties, including their diligence in keeping costs low and their skill in selecting 'which investments' belong 'in the plan's menu of options.'" (quoting *Hughes*, 595 U.S. at 176)). In sum, unlike in a defined-benefit plan, in a defined-contribution plan, neither the availability nor the quantity of pension benefits is guaranteed. *See Guyes v. Nestle USA, Inc.*, No. 20-CV-1560, 2023 WL 9321363, at *1 (E.D. Wis. Aug. 23, 2023), *adopted by* 2024 WL 218420 (E.D. Wis. Jan. 19, 2024).

1  account fees.  *See* Am. Compl. at ¶¶ 202–37 (docket no. 29).  Plaintiffs also assert that

2  the Committee breached its duties of loyalty and prudence and engaged in prohibited

3  transactions, and that Nordstrom and the Board failed to adequately monitor other

4  fiduciaries, in connection with the re-allocation of unvested contributions made by

5  Nordstrom that were forfeited when or after personnel left Nordstrom's employment.

6  *See id.* at ¶¶ 238–64.  Plaintiffs make two claims (Claims 1 and 2) concerning bundled

7  RKA expenses, two claims (Claims 3 and 4) regarding managed account fees, and four

8  claims (Claims 5, 6, 7, and 8) challenging the way in which forfeited contributions were

9  used.  Plaintiffs bring these claims on behalf of themselves and two subclasses of

10  similarly-situated individuals, namely a subclass relating to the claims concerning

11  bundled RKA expenses and forfeited contributions, and another subclass putatively

12  asserting the claims that challenge managed account fees.  *See id.* at ¶ 189.  The

13  Nordstrom Defendants seek dismissal of all claims pursuant to Federal Rule of Civil

14  Procedure 12(b)(6).

15  **Discussion**

16  **A.    Dismissal for Failure to State a Claim**

17      Although a complaint challenged by a Rule 12(b)(6) motion to dismiss need not

18  provide detailed factual allegations, it must offer "more than labels and conclusions" and

19  contain more than a "formulaic recitation of the elements of a cause of action."  *Bell Atl.*

20  *Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must indicate more than

21  mere speculation of a right to relief.  *Id.*  When a complaint fails to adequately state a

22  claim, such deficiency should be "exposed at the point of minimum expenditure of time

23  and money by the parties and the court."  *Id.* at 558.  A complaint may be lacking for one

of two reasons:  (i) absence of a cognizable legal theory, or (ii) insufficient facts to state a cognizable legal claim.  _Robertson v. Dean Witter Reynolds, Inc._, 749 F.2d 530, 534 (9th Cir. 1984).  On a Rule 12(b)(6) motion, the question for the Court is whether the facts in the operative pleading sufficiently state a "plausible" ground for relief.  _Twombly_, 550 U.S. at 570.  If the Court dismisses the complaint in part or in toto, it must consider whether to grant leave to amend.  _Lopez v. Smith_, 203 F.3d 1122, 1130 (9th Cir. 2000).

**B.    Factual Allegations:  Incorporation by Reference and Judicial Notice**

In deciding a motion to dismiss, the Court must assume the truth of a plaintiff's factual allegations and draw all reasonable inferences in the plaintiff's favor.  _See_, _e.g._, _Usher v. City of Los Angeles_, 828 F.2d 556, 561 (9th Cir. 1987).  The Court need not, however, accept allegations that are "conclusory, unwarranted deductions of fact, or unreasonable inferences."  _Khoja v. Orexigen Therapeutics, Inc._, 899 F.3d 988, 1008 (9th Cir. 2018).  If the Court, in assessing the sufficiency of the operative complaint, considers "matters outside the pleadings," it must convert the Rule 12(b)(6) motion into a motion for summary judgment, except in two circumstances:  (i) when the material at issue is incorporated by reference into the pleading; or (ii) when the Court may take judicial notice of facts "not subject to reasonable dispute" pursuant to Federal Rule of Evidence 201.  _See id._ at 998; _see also_ Fed. R. Civ. P. 12(d).  The Nordstrom Defendants have asked the Court to incorporate by reference and/or take judicial notice of (i) certain materials relating to Nordstrom, and (ii) particular documents concerning various other companies' 401(k) plans that were identified by plaintiffs in their Amended Complaint as comparators for the Nordstrom Plan.  The Court will do so for the following reasons.

1          **1.      <u>Nordstrom-Related Materials</u>**

2          In their operative pleading, plaintiffs quote from the 2021 Restatement of

3    Nordstrom's 401(k) Plan (the "2021 Restatement").  *See* Am. Compl. at ¶¶ 169–70

4    (docket no. 29).  A copy of the 2021 Restatement was not attached to the pleading, but

5    the Nordstrom Defendants have submitted the document and asked the Court to consider

6    it.  *See* Defs.' Request (docket no. 32); *see also* 2021 Restatement, Ex. 9 to Mandhania

7    Decl. (docket no. 31).  Plaintiffs have not objected, but rather have quoted from the

8    2021 Restatement in their response to the pending motion to dismiss, *see* Pls.' Resp. at

9    17–18 (docket no. 34), and the Nordstrom Defendants' request to incorporate the

10   document by reference is GRANTED.  The Plan's 2021 Restatement is quintessentially

11   the type of material that should be deemed incorporated by reference into a pleading, and

12   the doctrine permitting the Court to treat the 2021 Restatement as part of the Amended

13   Complaint serves the purpose of preventing plaintiffs from cherry picking among the

14   Plan's terms, perhaps omitting the provisions that "weaken—or doom—their claims."

15   *See* *Khoja*, 899 F.3d at 1002.

16         The Nordstrom Defendants also seek to supplement the record with (i) a copy of

17   the Form 5500 filed on behalf of the Plan for the plan year ending on December 31, 2023

18   (the "Nordstrom Form 5500"), and (ii) excerpts from the 2021 version of instructions (the

19   "Instructions") issued by the federal agencies that developed Form 5500, namely the

20   Department of the Treasury's Internal Revenue Service ("IRS"), the Department of Labor

21   ("DOL"), and the Pension Benefit Guaranty Corporation ("PBGC").  *See* Defs.' Request

22   (docket no. 32); Exs. 1 & 10 to Mandhania Decl. (docket no. 31); *see also* *Sigetich v.*

23   *Kroger Co.*, No. 21-cv-697, 2023 WL 2431667, at *4 n.2 (S.D. Ohio Mar. 9, 2023)

1   (observing that the IRS, DOL, and PBGC jointly offer the Form 5500 Series to enable

2   employee benefit plans to satisfy annual reporting requirements under the Internal

3   Revenue Code and Titles I and IV of ERISA).  The Nordstrom Form 5500 was explicitly

4   incorporated by reference into the operative pleading; plaintiffs themselves quoted from

5   the Report of Independent Auditors (Moss Adams LLP) for the Nordstrom Plan that was

6   appended to the form.  _See_ Auditors' Report at 9, Ex. 10 to Mandhania Decl. (docket

7   no. 31 at 372) ("Substantially all the administrative expenses, including recordkeeping,

8   trustee and other fees, incurred in connection with the Plan are paid by the Plan through

9   an allocation to participant accounts." (quoted in Am. Compl. at ¶ 59 (docket no. 29))).

10  Plaintiffs also repeatedly referenced service or compensation codes that are defined in the

11  Instructions, as well as some of the specific codes that appear in the Nordstrom Form

12  5500.  _See_ Am. Compl. at ¶¶ 63 & 67–69 (docket no. 29); _see also_ Instrs. for Schedule C

13  (Form 5500) at 29, Ex. 1 to Mandhania Decl. (docket no. 31 at 9).  Thus, the Instructions

14  were also incorporated by reference.

15          Plaintiffs assert, however, that the Nordstrom Defendants should not be allowed to

16  rely on the Nordstrom Form 5500 (or the Instructions) to "advance disputed facts or

17  calculations in support of their motion."  _See_ Pls.' Resp. at 11 n.4 (docket no. 34).  For

18  support, they rely on two district court decisions, one of which invoked only the doctrine

19  of judicial notice, and not incorporation-by-reference principles, and is therefore

20  distinguishable, _see_ _Schuster v. Swinerton Inc._, No. 24-cv-4970, 2025 WL 1069887

21  (N.D. Cal. Apr. 8, 2025) (cited in Pls.' Notice (docket no. 39)), and the other of which

22  improperly conflated the doctrines of incorporation by reference and judicial notice, _see_

23  _Coppel v. SeaWorld Parks & Ent., Inc._, No. 21-cv-1430, 2023 WL 2942462, at *10 n.12

(S.D. Cal. Mar. 22, 2023) (taking "judicial notice . . . because the document is
incorporated by reference in the operative complaint"). As explained by the Ninth
Circuit in _Khoja_, which was cited in both _Schuster_ and _Coppel_, the judicially-created
concept of incorporation by reference treats as part of the complaint itself any document
that forms the foundation of a plaintiff's claim (for example, the contract in a breach-of-
contract matter) or is referenced extensively in the pleading. _See_ 899 F.3d at 1002.
Indeed, as reiterated in _Khoja_, unlike with judicial notice, the Court may "assume [an
incorporated document's] contents are true for purposes of a motion to dismiss." _Id._ at
1003 (alteration in original, quoting _Marder v. Lopez_, 450 F.3d 445, 448 (9th Cir. 2006)
(quoting _United States v. Ritchie_, 342 F.3d 903, 908 (9th Cir. 2003))). A plaintiff may
not survive a Rule 12(b)(6) challenge by simply omitting from or misquoting in the
operative pleading any unfavorable provisions of materials that were incorporated by
reference. _See id._ at 1002.

In _Khoja_, the Ninth Circuit affirmed the district court's consideration of materials
that were quoted in the complaint or formed the basis of the plaintiff's claims, but it
concluded that the district court had abused its discretion in treating certain other
documents as incorporated by reference. _Id._ at 1003–08. The improperly accepted
submissions included a blog post that was tangential to the claims at issue, filings with
the Securities and Exchange Commission that were not referenced in the operative
pleading, a press release that was unconnected to the information in the complaint, and
the entire file history for a patent, which was not necessarily the source of the plaintiff's
factual allegations. _Id._ The Nordstrom-related materials at issue in this matter do not
resemble in any way the problematic documents in _Khoja_. Nothing in _Khoja_ suggests

1    that the Court may not rely on the representations made in the Nordstrom Form 5500,

2    which were certified by an independent auditor (Moss Adams LLP) and supported by the

3    auditor's appended report, even if such financial and other statements are inconsistent

4    with or omitted from the allegations of the Amended Complaint, and the Court will do so.

5    The Nordstrom Defendants' related request is therefore GRANTED, and the Court will

6    consider the substance of the Nordstrom Form 5500, as well as the Instructions.

7        **2.    Documents Concerning Other Companies' Plans**

8        The Nordstrom Defendants have also proffered materials concerning defined-

9    contribution plans established by other companies. *See* Exs. 3–8 & 11 to Mandhania

10   Decl. (docket no. 31); Ex. 7 to Mandhania Decl. (docket no. 23-9).[2]  These other

11   companies, namely, Aldi Inc. ("Aldi"), Deloitte LLP ("Deloitte"), Leidos, Inc.

12   ("Leidos"), Lowe's Companies, Inc. ("Lowe's"), and United Parcel Service of America,

13   Inc. ("UPS"), are five of the six entities with 401(k) plans that plaintiffs, in drafting their

14   operative pleading, chose as comparators for purposes of their claims relating to bundled

15   RKA expenses. *See* Am. Compl. at ¶¶ 66–68 & 116 (docket no. 29).  In the Amended

16   Complaint, plaintiffs include (i) a chart listing the service or compensation codes that

17

18   ———————————————

19   [2] One of the exhibits at issue was submitted in October 2024, when the Nordstrom Defendants
     sought dismissal of the original complaint. *See* Defs.' Mot. (docket no. 22); Ex. 7 to Mandhania
     Decl. (docket no. 23-9); Defs.' Req. (docket no. 24).  After the parties indicated in a stipulation
20   that plaintiffs intended to file an amended pleading, the initial motion to dismiss was stricken.
     *See* Minute Order (docket no. 28).  When the Nordstrom Defendants presented their now
21   pending motion to dismiss (along with additional exhibits), their initial request for judicial notice
     or incorporation by reference was still before the Court; it was not stricken until shortly before
22   plaintiffs filed their response to the renewed Rule 12(b)(6) motion, *see* Minute Order (docket
     no. 33).  The Court has therefore treated the exhibit filed in October 2024 in the same manner as
23   the materials about other 401(k) plans that were subsequently provided by the Nordstrom
     Defendants.

1   appear in each comparator plan's Form 5500 for a year during the period from 2018 to

2   2023, *id.* at ¶ 68; and (ii) a table containing data for each comparator plan (*i.e.*, number of

3   active plan participants, net assets of the plan, and amount of administrative expenses)

4   that is disclosed in its Form 5500 and/or its legally-required notice to participants, *see id.*

5   at ¶ 116.  The Court is persuaded that the various documents submitted by the Nordstrom

6   Defendants were incorporated by reference into the Amended Complaint.

7          The Court may also take judicial notice of the information in each Form 5500.

8   Each Form 5500, along with its various schedules and an appended auditor's report,

9   contains financial and other data that was verified by an independent auditor and reported

10  to the IRS, DOL, and/or PBGC.  For purposes of comparing the characteristics (assets,

11  expenses, number of participants, etc.) of the Nordstrom Plan to those of other plans, the

12  accuracy of the data in each Form 5500 "cannot reasonably be questioned," *see* Fed. R.

13  Evid. 201(b)(2).  Plaintiffs themselves have relied on these documents, which are

14  publicly available, and contrary to plaintiffs' contention, the Court is not required to

15  disregard them or their contents.  *See Johnson v. Providence Health & Servs.*, No. C17-

16  1779, 2018 WL 1427421, at *3 (W.D. Wash. Mar. 22, 2018) (taking judicial notice of

17  various documents "because they are publicly available and there is no dispute about

18  their authenticity" and also considering "information from these documents insofar as

19  they contradict allegations from the complaint"); *see also Perez-Cruet v. Qualcomm Inc.*,

20  No. 23-cv-1890, 2024 WL 2702207, at *1 n.2 (S.D. Cal. May 24, 2024); *England v.*

21  *DENSO Int'l Am., Inc.*, No. 22-11129, 2023 WL 4851878, at *4 n.6 (E.D. Mich. July 28,

22  2023), *aff'd*, 136 F.4th 632 (6th Cir. 2025).  The Nordstrom Defendants' request for

23

incorporation by reference and/or judicial notice of documents relating to comparator 401(k) plans is GRANTED.

**C.    Bundled Recordkeeping and Administrative Expenses**

According to the operative pleading, bundled RKA expenses cover a variety of services including recordkeeping, transaction processing, and communicating with plan participants, as well as accounting, auditing, consulting, legal, and trustee services.  Am. Compl. at ¶ 55 (docket no. 29).  The Amended Complaint alleges that bundled RKA services are "fungible and commoditized," that all "massive" 401(k) plans are offered the same set of bundled RKA services and may select among them like items at "an all-you-can-eat buffet," that the various providers offer the same quality and types of bundled RKA services, and that any differences in bundled RKA services "are immaterial to the price quoted . . . for such services."  *Id.* at ¶¶ 56–58.  The fees for these services are typically charged to ERISA plan participants either (i) as a flat rate per account, or (ii) as a percentage of the assets under management; the latter method is also known as revenue sharing.  *See* *Hughes*, 595 U.S. at 174; *Coppel*, 2023 WL 2942462, at *13.

During the years at issue, the Plan employed Alight Solutions, LLC ("Alight") as its recordkeeper.  *See* Am. Compl. at ¶ 21 (docket no. 29).  The Bank of New York Mellon ("BNYM") provided trustee services for the Plan.  *See id.* at ¶ 64.  In their Amended Complaint, plaintiffs have set forth, for the period from 2018 to 2023, the annual compensation that Alight received for its recordkeeping services.  *See id.* at ¶ 65.  Plaintiffs have also computed a figure characterized as "bundled RKA" expenses for each year.  *See id.* at ¶¶ 115.  Based on the number of participants in the Nordstrom Plan at the end of each year, which is reflected in multiple paragraphs of the operative pleading, *see*

ORDER - 10

*id.* at ¶¶ 6, 115, 116, 118, 153, & 179, the per capita shares of Alight's compensation and

the alleged "bundled RKA" expenses may be calculated. The following table

consolidates the raw and computed data provided by plaintiffs.

| Year | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|------|------|------|
| No. of Plan Participants | 80,250 | 81,116 | 78,556 | 105,901 | 104,811 | 103,450 |
| Alight's Compensation | $2.79 million | $2.56 million | $2.21 million | $2.65 million | $3.39 million | $3.42 million |
| **Amount Per Participant** | **$35** | **$32** | **$28** | **$25** | **$32** | **$33** |
| Bundled RKA Expenses | $2.80 million | $2.84 million | $2.74 million | $3.70 million | $3.57 million | $5.89 million |
| **Amount Per Participant** | **$35** | **$35** | **$35** | **$35** | **$34** | **$57** |

Am. Compl. at ¶¶ 65 & 115–16 (docket no. 29).[3]

### 1. **Standards Relating to Prudence**

The question before the Court is whether plaintiffs have adequately pleaded that

the Committee breached its duty of prudence in authorizing the Plan to draw from

---

[3] As explained above, Paragraphs 115 and 116 of the operative pleading contain figures for "bundled RKA" expenses that differ from the amounts paid to Alight, which were reported in Paragraph 65 of the Amended Complaint. Although plaintiffs allude to the fees paid to BNYM for its trustee services, *see* Am. Compl. at ¶ 64 (docket no. 29), the "bundled RKA" figure for 2023 ($5,887,412) bears no resemblance to the aggregate of Alight's and BNYM's compensation for that year ($4,606,680). *See id.* at ¶ 65; *see also* Nordstrom Form 5500, Ex. 10 to Mandhania Decl. (docket no. 31 at 340–41). This latter sum is also not a correct "bundled RKA" amount because it includes fees paid to BNYM in 2023 for investment management (code 28), in addition to trustee (codes 21 and 25), services. *See* Exs. 1 & 10 to Mandhania Decl. (docket no. 31 at 9 & 341). Moreover, the "bundled RKA" fee for 2018 that appears in Paragraphs 115 and 116 ($2,799,462) is almost equivalent to the compensation paid solely to Alight for 2018 ($2,790,335), as reported in Paragraph 65, which creates even further confusion concerning how plaintiffs arrived at the totals in Paragraphs 115 and 116. Finally, the large disparity between the bundled RKA expenses for 2023 ($5,887,412) and the prior years (ranging from $2,738,622 to $3,700,232, with an average of $3,129,950) cannot be correlated with an increase in Alight's compensation, which did not appreciably change between 2022 and 2023.

ORDER - 11

participants' accounts the funds needed to cover recordkeeping expenses.  Pursuant to

ERISA, a fiduciary of a 401(k) plan must act

> with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

29 U.S.C. § 1104(a)(1)(B).  In enforcing the duty of prudence, courts focus on both the

procedural and substantive aspects of an ERISA fiduciary's conduct, inquiring whether

the fiduciary followed prudent processes and made prudent decisions.  *See* *Tibble v.*

*Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016); *Fish v. GreatBanc Tr. Co.*, 749 F.3d

671, 680 (7th Cir. 2014).  The Ninth Circuit has not yet addressed the pleading standards

for a claim asserting that an ERISA fiduciary breached its duty of prudence with respect

to bundled RKA expenses, but district courts within the Ninth Circuit have considered the

issue.  *See* *Nagy v. CEP Am., LLC*, No. 23-cv-5648, 2024 WL 2808648 (N.D. Cal.

May 30, 2024); *Coppel*, 2023 WL 2942462 (S.D. Cal.); *Wehner v. Genentech, Inc.*,

No. 20-cv-6894, 2021 WL 507599 (N.D. Cal. Feb. 9, 2021); *Bouvy v. Analog Devices,*

*Inc.*, No. 19-cv-881, 2020 WL 3448385 (S.D. Cal. June 24, 2020).  Several circuits have

also provided guidance on the subject.  *See* *Singh v. Deloitte LLP*, 123 F.4th 88 (2d Cir.

2024); *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172 (3d Cir. 2024); *Matney v. Barrick*

*Gold of N. Am.*, 80 F.4th 1136 (10th Cir. 2023); *Matousek*, 51 F.4th at 279 (8th Cir.);

*Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022); *Smith v. CommonSpirit Health*, 37

F.4th 1160 (6th Cir. 2022).

In evaluating the sufficiency of the operative pleadings before them, some courts

have explicitly recognized that information about an ERISA fiduciary's "knowledge,

1    methods, or investigations at the relevant times" will usually reside in the fiduciary's

2    "exclusive possession," _Bouvy_, 2020 WL 3448385, at *3, and thus, ERISA plaintiffs are

3    ordinarily unable to plead exactly how or why a fiduciary selected and/or continued to

4    employ a recordkeeper.  _See_, _e.g._, _Wehner_, 2021 WL 507599, at *4 (observing that

5    "ERISA plaintiffs generally lack the inside information necessary to make out their

6    claims in detail unless and until discovery commences" (quoting _Pension Benefit Guar._

7    _Corp. ex rel. Saint Vincent Cath. Med. Ctr. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc._,

8    712 F.3d 705, 718 (2d Cir. 2013))); _see also_ _Munt v. WEC Energy Grp., Inc._, 728

9    F. Supp. 3d 957, 963 & n.5 (E.D. Wis. 2024) (remarking that the plaintiffs' specific

10   allegations of the fiduciary's "imprudent" negotiation with, and "ineffective" requests for

11   information from, the recordkeeper were "unusual" because plaintiffs drafted the

12   operative pleading "with the benefit of completed fact discovery").  As a result, these and

13   other courts have acknowledged that certain forms of circumstantial evidence might give

14   rise to a plausible inference of imprudence.  _See_ _Matousek_, 51 F.4th at 279 ("In the

15   absence of 'significant allegations of wrongdoing,' the way to plausibly plead a claim of

16   this type is to identify similar plans offering the same services for less."); _Matney_, 80

17   F.4th at 1148 (joining the Third, Sixth, Seventh, and Eighth Circuits in concluding that "a

18   claim for breach of ERISA's duty of prudence can be based on allegations that the fees

19   associated with the defined-contribution plan are too high compared to available, cheaper

20   options"); _see also_ _England_, 2023 WL 4851878 at *2 & n.4 ("To allege a breach of

21   fiduciary duty claim based on imprudent recordkeeping fees, a plaintiff must plead facts

22   that would allow a plausible inference that the recordkeeping fees were excessive relative

23   to the services rendered." (citing _Smith_, 37 F.4th at 1169)); _Dionicio v. U.S. Bancorp_,

ORDER - 13

1  No. 23-CV-26, 2024 WL 1216519, at *3 (D. Minn. Mar. 21, 2024) ("Because ERISA

2  plaintiffs often lack information about a fiduciary's decision-making process, plaintiffs

3  typically satisfy 'the pleading bar by alleging enough facts to '_infer_ . . . that the process

4  was flawed.''" (emphasis in original, citations omitted)).

5         The level of detail required to "nudg[e] an inference of imprudence from possible

6  to plausible," _Matousek_, 51 F.4th at 278, has varied from court to court and case to case.

7  In two different cases, the Northern District of California did <u>not</u> conduct an "apples to

8  apples" assessment of the plan at issue and its alleged comparators, indicating that such

9  rigor is not required by the Ninth Circuit.  _See Schuster_, 2025 WL 1069887, at *5; _Nagy_,

10  2024 WL 2808648, at *4 (remarking that, to survive a motion to dismiss, ERISA

11  plaintiffs need not provide "granular, micro-level 'apples to apples' comparisons, based

12  on data to which they may not yet have access").[4]  This approach is <u>not</u> consistent with

13  the views of most circuits that have addressed the issue.  _See Singh_, 123 F.4th at 95

14  (affirming a dismissal and later denial of a motion to amend, observing that "Plaintiffs do

15  not appear to draw 'apple-to-apple' comparisons even when relying on disclosure

16  documents filed by the Plan and its alleged comparators – documents we properly

17  ────────────────────

18  [4] _Nagy_ is distinguishable.  In _Nagy_, the district court considered a 2021 survey cited by the plaintiffs, which found that $50 per year per participant was a benchmark for recordkeeping

19  services, as well as the opinion of a defense expert in another case, which was proffered by the plaintiffs and not contested by the defendants.  _See_ 2024 WL 2808648, at *4.  Unlike the

20  plaintiffs in _Nagy_, plaintiffs in this action do not cite any studies.  To the contrary, plaintiffs disparage surveys as "inadequate to determine a reasonable Bundled RKA fee" because they are

21  "skew[ed] to higher 'average prices'" and "favor inflated Bundled RKA fees."  _See_ Am. Compl. at ¶ 99 (docket no. 29).  For the same reason, _Bouvy_ does not support plaintiffs' position.  In

22  _Bouvy_, the plaintiff cited to the 401(k) Averages Book (19th ed. 2019).  _See_ 2020 WL 3448385, at *2 (citing 1st Am. Compl. at ¶ 134).  Unlike the plaintiff in _Bouvy_, plaintiffs in this

23  matter do not rely on the 401(k) Averages Book or any similar source of statistical information about 401(k) plans.

consider here, when integral to the [operative pleading]"); _Matney_, 80 F.4th at 1149 ("A

court cannot reasonably draw an inference of imprudence simply from the allegation that

a cost disparity exists; rather, the complaint must state facts to show the funds or services

being compared are, indeed, comparable.  The allegations must permit an apples-to-

apples comparison."); _Matousek_, 51 F.4th at 278 (requiring that "a sound basis for

comparison—a meaningful benchmark" be pleaded); _Smith_, 37 F.4th at 1169 (indicating

that the claim relating to recordkeeping expenses had not moved "from possibility to

plausibility" because the plaintiff had not pleaded that the services covered by the

challenged fees were "equivalent to those provided by the plans comprising the average

in the [cited] industry publication").

### 2.    Plaintiffs' Chosen Comparators

In the absence of specific Ninth Circuit jurisprudence, and in light of the opinions

expressed by at least five other Circuits, the Court concludes that when, as here, ERISA

plaintiffs rely on self-selected data about alleged comparators, as opposed to industry

surveys, independent studies, or the like, _see supra_ note 4, they must provide sufficient

indicia of an apples-to-apples comparison to warrant an inference of imprudence and

plausibly state a claim against an ERISA fiduciary.  In this case, plaintiffs have not

satisfied this standard for two reasons:  (i) they have pleaded inconsistent and implausible

allegations; and (ii) they have introduced too much disparity between the Plan and the

alleged comparators.

### a.    Inconsistent and Implausible Allegations

The Court agrees with the Nordstrom Defendants that plaintiffs' narrative about

the Plan's recordkeeper (Alight) is "contradictory and incoherent."  _See_ Defs.' Mot. at 11

1  (docket no. 30). The operative pleading indicates that Alight both does and does not

2  offer trustee services. *Compare* Am. Compl. at ¶ 69 (docket no. 29) (an "analysis

3  focused on . . . trustee fees (codes 21, 25, 50, 99) *provided by Alight* is an appropriate

4  method" (emphasis added)) *with id.* at ¶ 64 ("Alight is a recordkeeper only and does not

5  provide . . . trustee services"). Moreover, plaintiffs state that "[t]his action focuses only

6  on **Plan Bundled RKA fees paid to Alight**," *id.* at ¶ 63 (emphasis in original), but they

7  also challenge amounts paid to BNYM for trustee (and perhaps other) services, *see id.* at

8  ¶¶ 64–65. With regard to trustee services, plaintiffs contradict themselves by saying, in

9  one paragraph, that BNYM was paid by Alight, *id.* at ¶ 64, and in the next paragraph, that

10  BNYM was paid by the Plan, *id.* at ¶ 65. Although plaintiffs allege that the bundled

11  RKA services provided by Alight to the Nordstrom Plan were <u>not</u> "exceptional, unusual,

12  or customized," *id.* at ¶ 62, they inconsistently contend that Alight did not operate within

13  "industry standard" because it did not include trustee services in its bundled RKA fees,

14  *id.* at ¶ 71. As to the latter point, information about three plans chosen by plaintiffs as

15  comparators, namely the Deloitte, Lowe's, and UPS plans, entirely undermines plaintiffs'

16  assertion that the industry practice is to bundle recordkeeping and trustee services. *See*

17  Ex. 8 to Mandhania Decl. (docket no. 31 at 214–15) (disclosing that the Deloitte plan

18  compensated Vanguard Group Inc. ("Vanguard") for recordkeeping, but not trustee,

19  services); Ex. 7 to Mandhania Decl. (docket no. 23-9 at 15) (showing that the Lowe's

20  plan employed Wells Fargo Bank, N.A. ("Wells Fargo")[5] for recordkeeping, but not

21

22

23  [5] In 2021, the Lowe's plan switched recordkeeping providers; Wells Fargo charged $620,029 for part of the year, and Principal Life Insurance Company ("Principal") was paid $845,437 for the

1    trustee, services); Ex. 7 to Mandhania Decl. (docket no. 31 at 175–76 & 198) (indicating

2    that the UPS plan paid Voya Financial, Inc. ("Voya") for recordkeeping and that both

3    State Street Bank ("SSB") and BNYM received compensation for trustee services, with a

4    transition between the entities occurring on July 1, 2020); *see also* Am. Compl. at ¶ 68

5    (listing service and compensation codes that correlate with the above summaries about

6    the Deloitte and UPS plans.  Finally, plaintiffs' suggestion that bundled RKA expenses

7    are not affected by any differences in the RKA services that are actually provided, *see*

8    Am. Compl. at ¶ 58 (docket no. 29), is not only conclusory, and therefore not entitled to

9    an assumption of truth, but also belied by the data about the Deloitte, Lowe's, and UPS

10   plans, and, as indicated by at least two other district courts, implausible.  *See Probst v. Eli*

11   *Lilly & Co.*, No. 22-cv-1106, 2023 WL 1782611, at *11 (S.D. Ind. Feb. 3, 2023) (finding

12   "not plausible" the plaintiff's "allegations that any difference in services provided does

13   not affect the price of the services," and noting that the plaintiff's "own chart indicates

14   that the 13 comparator plans paid between $23 to $39 per participant, reflecting . . . some

15   variation in price"); *Sigetich*, 2023 WL 2431667, at *9 (observing that "the differences in

16

17

18   remainder of the year.  *See* Am. Compl. at ¶ 66 (docket no. 29); *see also* Note 1 to Financial
     Statements, 2021 Form 5500, Ex. 7 to Mandhania Decl. (docket no. 23-9 at 38) (indicating that
19   Principal had acquired Wells Fargo's "Institutional Retirement and Trust" business in 2019 and
     began serving as "trustee and recordkeeper" for the Lowe's plan on June 18, 2021).  Although
20   the operative pleading alleges that the Lowe's plan reported a code for trustee services, *see* Am.
     Compl. at ¶ 68 (docket no. 29), it does not specify the year in which the Lowe's plan might have
21   done so, and in 2021, when the Lowe's plan was transitioning between and employed both
     entities that served as recordkeepers for the relevant period, *see id.* at ¶ 66 (identifying the
22   Lowe's plan's service providers for 2018–2023), the Lowe's plan did not use on its Form 5500
     any "trustee" codes (*i.e.*, 20, 21, 24, or 25) with respect to either Wells Fargo or Principal, *see*
23   Ex. 7 to Mandhania Decl. (docket no. 31 at 15).

ORDER - 17

1   costs and the differences in services reported among the comparable plans suggest that

2   even minor variations in services impact per participant recordkeeping fees").

3                    **b.        Differences Between the Plan and Alleged Comparators**

4          Plaintiffs allege that the annual bundled RKA expenses for the Nordstrom Plan for

5   the period from 2018 through 2023 were an "effective average" of $39 per participant,

6   but a "reasonable" annual fee for the same period was $21 per participant.  *See* Am.

7   Compl. at ¶¶ 115–16 (docket no. 29).  Plaintiffs' cherry-picked data purporting to support

8   this proposition suffers from two fundamental flaws:  (i) it relies on inconsistent or

9   incorrect information; and (ii) it involves plans that are not sufficiently similar in size

10  and/or manner of compensating recordkeepers.

11                        **i.        Inconsistent or Incorrect Information**

12         As indicated earlier, plaintiffs have offered two different and inconsistent sets of

13  data for the bundled RKA expenses paid by the Nordstrom Plan.  Based on Alight's

14  compensation, as reflected in Paragraph 65 of the operative pleading, the average annual

15  expense per participant for the six years at issue (2018–2023) was roughly $31 (and not

16  $39, as calculated by plaintiffs using a different set of figures described as "bundled

17  RKA" expenses).  Plaintiffs have not adequately explained either the inconsistencies

18  between the two groups of numbers (Alight's compensation versus "bundled RKA"

19  expenses) or the outlier figures for 2023.  *See supra* note 3 (noting that the $23 per

20  participant increase in calculated "bundled RKA" expenses from 2022 to 2023 cannot be

21  correlated with a change in Alight's fees for the same period, which rose by only $1 per

22  participant).

23

1

ii. __Dissimilar Plans__

2        The operative pleading contains information about the Nordstrom Plan spanning

3   the years 2018 through 2023.  It also provides figures for six other 401(k) plans, in two

4   different formats:  (A) multi-year data for three alleged comparators, and (B) single-year

5   data for the three remaining entities.  The Nordstrom Defendants accuse plaintiffs of

6   engaging in an "apples-to-oranges" analysis by comparing averages or amounts across

7   multiple years to single-year per capita expenses.  _See_ Defs.' Mot. at 16–17 (docket

8   no. 30).  The Court agrees that the two types of information cannot be correlated, and

9   thus, the multi-year and single-year data are considered separately.

10                          A.   __Multi-Year Data__

11        Plaintiffs have provided multi-year data for the Aldi, Lowe's, and UPS plans, as

12   well as the Nordstrom Plan.  Although plaintiffs did not state for every year at issue the

13   number of participants in each allegedly comparable plan, the missing figures may be

14   computed from the other information plaintiffs did offer in their operative pleading, _see_

15   Am. Compl. at ¶ 66 (docket no. 29), and the amounts derived in this manner are

16   identified with brackets in the following table.  With one exception, which is discussed

17   _infra_ note 7, the following table reproduces what plaintiffs have alleged were the

18   "bundled RKA" expenses paid each year by the different comparators.[6]  As reflected

19   _infra_ notes 8–10, some of plaintiffs' allegations about "bundled RKA" expenses are

20

21   _____

22   [6] For purposes of the table in this subsection, the Court has disregarded plaintiffs' 2023 figures for the Nordstrom Plan because (i) they are plausibly the result of computational error, _see_ _supra_

23   note 3, and (ii) plaintiffs did not offer any 2023 data for two of the three comparators (Aldi and UPS).

ORDER - 19

inconsistent with data plaintiffs have provided or information in the plan's Form 5500,

and the related (likely erroneous) per capita figures are surrounded by red asterisks.

| PLAN (recordkeeper and trustee) | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| **Nordstrom Plan (Alight and BNYM)** | $2.80 million | $2.84 million | $2.74 million | $3.70 million | $3.57 million |
| No. of Plan Participants | 80,250 | 81,116 | 78,556 | 105,901 | 104,811 |
| Amount Per Participant | **$35** | **$35** | **$35** | **$35** | **$34** |
| **Aldi plan (T. Rowe Price RPS, Inc.)** | $1.68 million | $1.82 million | $1.72 million | $1.84 million | $1.91 million |
| No. of Plan Participants | [41,022] | [49,119] | 49,311 | 56,577 | [59,812] |
| Amount Per Participant | **$41** | **$37** | **$35**[7] | **$33**[7] | **$32** |
| **Lowe's plan (Wells Fargo/Principal)** | $1.01 million | $1.12 million | $3.07 million | $2.86[8] million | $1.32 million |
| No. of Plan Participants | [152,399] | [164,226] | [171,787] | 154,402[9] | [149,408] |
| Amount Per Participant | **[$7]** | **[$7]** | **[$18]** | **\* $18 \*** | **[$9]** |
| **UPS plan (Voya and SSB/BNYM)** | $3.20 million | $ 3.19 million | $ 2.14 million | $3.11[10] million | $ 2.85 million |
| No. of Plan Participants | [120,738] | [132,723] | [147,155] | 135,312 | [136,120] |
| Amount Per Participant | **[$26]** | **[$24]** | **[$14]** | **\* $23 \*** | **[$21]** |

Am. Compl. at ¶¶ 66 & 116 (docket no. 29).

---

[7] Notwithstanding the details about payments by Aldi plan participants to recordkeeper and trustee T. Rowe Price Retirement Plan Services, Inc. ("T. Rowe Price"), which are set forth in Paragraph 66 of the operative pleading, plaintiffs attempt to use for comparison purposes, without any explanation, fees of $25 and $23 per participant for the years 2020 and 2021, respectively. *See* Am. Compl. at ¶ 116 (docket no. 29). Plaintiffs may not ignore the specific allegations of their operative pleading in favor of inconsistent and insufficiently developed ones.

[8] This number appears in Paragraph 116 of the operative pleading, but it is inconsistent with the data in Paragraph 66, which reflects that the aggregate of Wells Fargo's and Principal's fees for 2021 was $1.46 million. *See* Am. Compl. at ¶¶ 66 & 116 (docket no. 29).

[9] This figure, which appears in Paragraph 116 of the Amended Complaint, is different from the number of participants with account balances at the end of the 2021 Lowe's plan year, which was reportedly 158,184. *See* Ex. 7 to Mandhania Decl. (docket no. 23-9 at 3).

[10] This amount, which is set forth in Paragraph 116, is inconsistent with Paragraph 66 of the operative pleading, which reflects that the combination of compensation paid to Voya, SSB, and BNYM in 2021 was $3.99 million. *See* Am. Compl. at ¶¶ 66 & 116 (docket no. 29).

ORDER - 20

1   For the following reasons, the multi-year information offered by plaintiffs does not

2   support an inference that the recordkeeping and trustee expenses paid by the Nordstrom

3   Plan during the period from 2018 through 2022 were excessive.  First, the average annual

4   amount associated with the Nordstrom Plan ($34.80) was actually less (not greater) than

5   the average annual amount experienced by Aldi plan participants ($35.60).  Second,

6   when plaintiffs' own data is used to compute the UPS plan's recordkeeping and trustee

7   expenses for 2021, *see supra* note 10, the disparity between the Nordstrom Plan's

8   ($35 per participant) and the UPS plan's ($29 (not $23) per participant) "bundled RKA"

9   expenses for that year is much less than plaintiffs have asserted.  Third, this $6 per year

10  per participant difference in fees cannot give rise to an inference of imprudence when

11  viewed in light of the notes provided by the UPS plan's independent auditor:

> Administrative expenses of the Plan are paid by the plan and UPS as provided
> in the Plan documents.  UPS provides certain accounting, audit, legal and
> other administrative services to the Plan *free of charge*.

14  Ex. 7 to Mandhania Decl. (docket no. 31 at 199) (emphasis added).  Fourth, plaintiffs do

15  not even hint that the Lowe's plan's average annual fee (*i.e.*, $10 per participant[11]) was

16  an appropriate benchmark for the Nordstrom Plan, and thus, the comparison between the

17  Nordstrom Plan and the Lowe's plan establishes nothing.  Finally, in arriving at their

---

[11] But for plaintiffs' discrepancies concerning the 2021 figures for the Lowe's plan, *see supra* notes 8 and 9, the average annual RKA fee charged to Lowe's plan participants was $10 (*i.e.*, $7 per year in 2018 and 2019, $9 per year in 2021 and 2022, and $18 in 2020).  The higher RKA amount for 2020 seems related to the sale in 2019 of Wells Fargo's 401(k) servicing business to Principal, *see supra* note 5, and if the anomalous data for 2020 is disregarded, the average annual RKA expense for the Lowe's plan is only $8 per participant.  Plaintiffs offer no explanation for why Lowe's plan participants consistently pay substantially less in RKA fees than the participants of any other comparator selected by plaintiffs, and absent more information indicating that the Lowe's plan and the other identified plans are truly like-for-like, the Lowe's plan data must be considered atypical.

ORDER - 21

alleged reasonable annual RKA fee, plaintiffs relied on the figures exposed earlier as miscalculations, *see supra* notes 7–10, and on outlier data without any accompanying explanation, *see supra* note 11, and thus, plaintiffs' estimate of $21 per participant each year for the period from 2018 to 2023, *see* Am. Compl. at ¶ 116 (docket no. 29), will not be treated as a factual allegation entitled to an assumption of truth.

## B.    Single-Year Data

Plaintiffs also rely on single-year information about the Deloitte, FMR LLC ("Fidelity"), and Leidos 401(k) plans, which is reproduced in the following table:

| PLAN (recordkeeper and trustee) | 2020 | 2021 | 2022 |
|---|---|---|---|
| Nordstrom Plan (Alight & BNYM) | $2.74 million | $3.70 million | $3.57 million |
| No. of Plan Participants | 78,556 | 105,901 | 104,811 |
| Amount Per Participant | $35 | $35 | $34 |
| Net Assets at End of Plan Year | $3.83 billion | $4.15 billion | $3.44 billion |
| Deloitte plan[12] (Vanguard) | | $2.35 million | |
| No. of Plan Participants | N/A | 98,051 | |
| Amount Per Participant | | $24[13] | |
| Net Assets at End of Plan Year | | $9.95 billion | |
| Fidelity plan (Fidelity) | $0.898 million | | |
| No. of Plan Participants | 64,113 | N/A | |
| Amount Per Participant | $14 | | |
| Net Assets at End of Plan Year | $24.33 billion | | |

---

[12] Although plaintiffs did not specify in their operative pleading the year for which they provided information about the Deloitte plan, the net assets and the number of plan participants with account balances at the end of the plan year that are set forth in the operative pleading match the figures in the Form 5500 for the period from May 30, 2021, to May 28, 2022, which was the Deloitte plan's fiscal year. *Compare* Ex. 8 to Mandhania Decl. (docket no. 31 at 210 & 224) *with* Am. Compl. at ¶ 116 (docket no. 29).

[13] This figure is inconsistent with the Deloitte plan's notice dated May 21, 2021, which advises that each plan participant incurs an annual fee of $29 (not $24) for "general plan administrative services." Ex. 4 to Mandhania Decl. (docket no. 31 at 68).

ORDER - 22

| PLAN (recordkeeper and trustee) | 2020 | 2021 | 2022 |
|---|---|---|---|
| **Leidos plan (Vanguard)** | | $1.08 million | |
| No. of Plan Participants | N/A | 46,995 | |
| Amount Per Participant | | **$23**[14] | |
| Net Assets at End of Plan Year | | **$10.03 billion** | |

Am. Compl. at ¶ 116 (docket no. 29).  Plaintiffs' contention that the Deloitte, Fidelity, and Leidos plans are appropriate comparators for the Nordstrom Plan lacks merit for at least three important reasons.

First, the annual amount per participant that plaintiffs have provided for the Deloitte, Fidelity, and Leidos plans does not account for trustee services, which have been included in the figures for the Nordstrom Plan.  As pleaded by plaintiffs, neither the Deloitte plan nor the Fidelity plan listed any trustee-related code in Form 5500.  _See id._ at ¶ 68.  The Deloitte plan's Form 5500 confirms this allegation of the Amended Complaint. _See_ Ex. 8 to Mandhania Decl. (docket no. 31 at 214–15).  The Leidos plan's May 2022 notice describes as only an annual "recordkeeping fee" the per-participant figure against which plaintiffs seek to compare the Nordstrom Plan's expenses for both recordkeeping and trustee services.  _See supra_ note 14.  Plaintiffs have not pleaded the requisite like-for-like comparison.

Second, the disparities between the various plans' annual per capita amounts of recordkeeping expenses are plausibly related to the quantum of and/or methods of

---

[14] In a notice dated May 27, 2022, the Leidos plan advised that "[a]n annual plan recordkeeping fee of $23 is charged to each plan participant."  Ex. 11 to Mandhania Decl. (docket no. 31 at 390).  Plaintiffs have used this figure as the annual amount of bundled RKA expenses paid by each Leidos plan participant without discussing whether it includes fees for trustee services.

payment for RKA services rather than any imprudence on the part of the Nordstrom Plan

fiduciary. For example, Fidelity, which is "the largest 401(k) recordkeeper in the

country," _see_ Am. Compl. at ¶ 86 (docket no. 29), serves as the recordkeeper for its own

401(k) plan, and through at least March 2020, it credited back to the plan all

recordkeeping and other expenses that it charged, resulting in a net expenditure by the

plan of $0. _See Moitoso v. FMR LLC_, 451 F. Supp. 3d 189, 213–14 (D. Mass. 2020). In

_Moitoso_, Fidelity did not dispute that its plan's fiduciaries declined to monitor

recordkeeping expenses, which were $288 per participant in 2017, but it argued that no

fiduciary duty was violated because all expenses that were paid to Fidelity were returned

to the plan through a mandatory "Revenue Credit" for qualified employees. _See id._ In

other words, for the year that plaintiffs have selected for comparison purposes (2020), a

portion of the Fidelity plan's participants (_i.e._, most, if not all, of Fidelity's then-current

employees) paid, in effect, no RKA or other fees, and the Fidelity plan is clearly not an

appropriate comparator.

     Similarly, the Deloitte plan is not analogous to the Nordstrom Plan for reasons that

appear in the notes of the Deloitte plan's independent auditor:

> Certain expenses of maintaining the Plan are paid directly by the U.S. Firms
> and are excluded from these financial statements. Certain recordkeeping fees
> are charged directly to the participants' accounts then transferred to and paid
> from the Plan's revenue account. Fees incurred by the Plan for the
> investment management services and certain participant recordkeeping fees
> are included in net appreciation (depreciation) in fair value of investments,
> because they are paid through revenue sharing, rather than a direct payment
> from the Plan.

Ex. 8 to Mandhania Decl. (docket no. 31 at 238). As indicated, although the Deloitte

plan's participants might pay less in flat fees assessed directly by the recordkeeper

ORDER - 24

(Vanguard), they might incur additional recordkeeping expenses as a percentage of the assets in their respective accounts. In addition, some of the fee differential between the Deloitte and Nordstrom plans might be regularly absorbed by Deloitte itself. Despite having relied for support on the Deloitte plan's Form 5500, plaintiffs' operative pleading does not mention or address these unfavorable provisions, and given the absence of any allegation about why these differences are immaterial, the Deloitte plan cannot serve as a comparator.

Third, the Deloitte, Fidelity, and Leidos plans are too different in size from the Nordstrom Plan to permit an apples-to-apples comparison. The following table illustrates the disparities by providing the computed ratios relating to participants and assets; for plans with fiscal years that span the calendar (and the Nordstrom Plan's fiscal) year, ratios for each relevant Nordstrom Plan year are indicated:

| Plan | Participants | Ratios to Nordstrom Plan | Net Assets | Ratios to Nordstrom Plan |
|---|---|---|---|---|
| Nordstrom Plan | 2020: 78,556<br>2021: 105,901<br>2022: 104,811 | N/A | 2020: $3.83 billion<br>2021: $4.15 billion<br>2022: $3.44 billion | N/A |
| Deloitte plan | 98,051 | 2021: 0.9-to-1<br>2022: 0.9-to-1 | $9.95 billion | 2021: 2.4-to-1<br>2022: 2.9-to-1 |
| Fidelity plan | 64,113 | 2020: 0.8-to-1 | $24.33 billion | 2020: 6.3-to-1 |
| Leidos plan | 46,995 | 2021: 0.4-to-1<br>2022: 0.4-to-1 | $10.03 billion | 2021: 2.4-to-1<br>2022: 2.9-to-1 |

_See_ Am. Compl. at ¶ 116 (docket no. 29). Each of the alleged comparators has more than twice the assets of the Nordstrom Plan. The Fidelity plan exceeded the Nordstrom Plan in assets by a factor of at least six, while having only roughly eighty percent (80%) of the number of participants.

1      Plaintiffs insist that the cost of recordkeeping services depends primarily on the

2  number of plan participants, *see id.* at ¶ 52, but they attempt to compare the Nordstrom

3  Plan to a plan (*i.e.*, the Leidos plan) with less than half the number of participants (44–

4  45%, depending on the year).  By plaintiffs' own metric, the Leidos plan is not a suitable

5  comparator.  Plaintiffs also inconsistently postulate that "massive"[15] 401(k) plans have

6  the type of bargaining power that can drive down RKA expenses, *see id.* at ¶¶ 9 & 108–

7  10, thereby acknowledging that, for purposes of comparing the RKA expenses of

8  defined-contribution plans, the relative assets of the plans are paramount.  Common sense

9  supports the notion that, contrary to plaintiffs' conclusory statement, the amount of a

10  plan's assets, rather than the number of its participants, correlates with the plan's ability

11  to negotiate lower fees; even when plans have a lot of participants, they might not qualify

12  as "mega" or "massive" plans if the participants and/or the sponsors do not contribute

13  much to them, and recordkeeping businesses are less likely to reduce their charges for a

14  plan that has an enormous number of participants and only a moderate or meager amount

15  of assets.  Because the Deloitte, Fidelity, and Leidos plans are so much larger in terms of

16  assets than the Nordstrom Plan, they would be expected to pay less in recordkeeping

17

18

19

---

20  [15] Plaintiffs have not indicated what makes a plan "massive," but litigants in other cases have
21  defined the similar term "mega" with respect to solely the quantum of assets in a plan. *See Dionicio*, 2024 WL 1216519, at *3 (indicating that a "mega" plan has more than $500 million in assets); *Guyes*, 2023 WL 9321363, at *4 (same); *England*, 2023 WL 4851878, at *3 (same);
22  *Sigetich*, 2023 WL 2431667 (same); *Probst*, 2023 WL 1782611, at *3 (same); *see also Munt*, 728 F. Supp. 3d at 962 (stating that the plan at issue was "considered a 'mega 401(k) plan' based
23  on the amount of assets under its management").

fees,[16] and thus, the figures that plaintiffs have furnished are plausibly explained by the

higher bargaining power of the alleged comparators, as opposed to any imprudence on

the part of the Nordstrom Plan fiduciary.[17]  Having failed to "nudg[e] an inference of

---

[16] This expectation is supported by two cases on which plaintiffs rely, namely _Schuster_ and _Remied v. NorthShore Univ. HealthSystem_, No. 22-cv-2578, 2024 WL 3251331 (N.D. Ill. July 1, 2024).  In _Schuster_, three of the comparators identified by the plaintiffs were provided recordkeeping services by Vanguard.  2025 WL 1069887, at *3.  These comparators paid annual amounts for recordkeeping ranging in 2021 from $37 to $49 per participant.  _Id._  According to the operative pleading in this action, during the same timeframe, Vanguard charged the Leidos plan only $23 per participant, while the Deloitte plan paid Vanguard $24 per participant.  _See_ Am. Compl. at ¶ 116 (docket no. 29).  The latter allegation is likely erroneous.  _See supra_ note 13 (observing that the Deloitte plan notified its participants of a $29 (not $24) annual fee).  Both the Leidos and Deloitte plans, which have roughly $10 billion in assets, are at least fourteen (14) times larger than the Vanguard-employing plans in _Schuster_, which ranged in size from $515 to $688 million in assets.  _See_ 2025 WL 1069887, at *3.  The lower RKA fees reportedly paid by the Leidos and Deloitte plans are consistent with their relative size vis-à-vis the relevant plans in _Schuster_.  Similarly, in _Remied_, comparators that employed Vanguard as their recordkeeper were charged more, and were one or more orders of magnitude smaller, than the Leidos and Deloitte plans.  _See Remied_, 2024 WL 3251331, at *9 (indicating that, on an annual basis sometime during the period from 2016 to 2020, one plan paid Vanguard $42 and the other was charged $31 per participant, and that the various comparator plans ranged from $5.5 million to $1.3 billion in assets).

[17] Importantly, this case does not involve the degree of disparity in recordkeeping fees that were at issue in _Bouvy_ or _Schuster_, which are district court matters within the Ninth Circuit on which plaintiffs rely.  In _Bouvy_, the plan at issue compensated its recordkeeper through revenue sharing until June 2015, and then it began charging an annual fee of $125 per participant.  _See_ 2020 WL 3448385, at *2.  In 2017, the plan in _Bouvy_ paid its recordkeeper $229 per participant.  _Id._  The plaintiffs in _Bouvy_ alleged that the average recordkeeping fee for a comparably-sized plan was $5 per participant; this figure was presumably a monthly amount, meaning that the average annual amount was $60 per participant, or roughly over two-to-three-and-a-half times less than the challenged expenses.  _See id._  In _Schuster_, the plan-in-suit was alleged to have paid fees of $111 and $145 per participant in 2018 and 2021, respectively, while the comparators incurred recordkeeping expenses ranging from $20 to $57 in 2018 and $37 to $49 in 2021, or between almost two and over four-and-half times less than the plan.  _See_ 2025 WL 1069887, at *3.  The differences in per capita annual RKA expenses identified by plaintiffs in this matter do not come close to the variances described in _Bouvy_ and _Schuster_, and they are therefore more plausibly explained by market forces relating to plan size and bargaining strength.  Moreover, the amounts allegedly paid by Nordstrom Plan participants each year from 2018 to 2022 ($34–$35) are generally on par with or less than the recordkeeping expenses incurred during the same timeframe by the participants in the comparator plans identified in _Bouvy_ ($60 per year) and _Schuster_ ($20–$57, with an average of $41 annually).  _See Bouvy_, 2020 WL 3448385, at *2; _see_

1    imprudence from possible to plausible," _Matousek_, 51 F.4th at 278, plaintiffs have not

2    stated a claim in connection with bundled RKA expenses.  Although plaintiffs are

3    unlikely to be able to cure the deficiencies of their pleading, the Court is not convinced

4    that they cannot do so, and thus, they will be given leave to amend.  _See_, _e.g._, _Eminence_

5    _Capital, LLC v. Aspeon, Inc._, 316 F.3d 1048, 1052 (9th Cir. 2003) (indicating that the

6    Ninth Circuit conducts a de novo review of a dismissal with prejudice to assess whether

7    the complaint could have been saved by amendment).  With regard to the first and second

8    claims of the Amended Complaint against, respectively, the Committee for breach of the

9    duty of prudence, and Nordstrom and the Board for failure to monitor,[18] defendants'

10   Rule 12(b)(6) motion is GRANTED, and those claims are DISMISSED without

11   prejudice.

12   **D.    Managed Account Fees**

13          When Nordstrom Plan participants voluntarily choose to use managed account

14   services offered by Alight Financial Advisors ("AFA"), a subsidiary of Alight, they

15   delegate to AFA the discretion to make various decisions, including which of the Plan's

16   investment options to select and how to allocate assets among them.  _See_ Am. Compl. at

17   _____

18   _also_ _Schuster_, 2025 WL 1069887, at *3.  Simply put, the recordkeeping fees at issue in this case
     do not sound the types of alarms that have pushed the imprudence claims in other cases beyond

19   the threshold of plausibility.  _See also_ _Remied_, 2024 WL 3251331, at *9 (summarizing the range
     of comparator RKA fees as $31–$42, with an average of $34, and observing that the challenged

20   plan's fees ($107 on average) were "three times as much").

21   [18] A claim that an ERISA fiduciary (here, Nordstrom and the Board) failed to adequately monitor
     a delegee (in this matter, the Committee) is derivative of the underlying breach-of-fiduciary-duty

22   claim.  _See_ _Singh_, 123 F.4th at 98; _Munt_, 728 F. Supp. 3d at 976 (citing _Albert_, 47 F.4th at 583);
     _Dionicio_, 2024 WL 1216519, at *6; _Wehner_, 2021 WL 507599, at *11.  If the predicate breach-
     of-fiduciary-duty claim fails, so too must the failure to monitor claim.  _See_, _e.g._, _Barrett v._

23   _O'Reilly Auto., Inc._, 112 F.4th 1135, 1140 (8th Cir. 2024); _Wehner_, 2021 WL 507599, at *11.

¶¶ 135 & 137 (docket no. 29).  Plaintiffs allege that AFA receives advice from Edelman

Financial Engines ("Edelman").  *See id.* at ¶ 138.  The Nordstrom Plan, however, refers

to AFA's sub-advisor as Financial Engines Advisors L.L.C. ("FEA").  *See* Nordstrom

Plan Annual Fee Disclosure Statement at 4 (Oct. 2023), Ex. 2F to Mandhania Decl.

(docket no. 31 at 52).[19]  Plaintiffs further allege that Nordstrom Plan participants who

were provided managed account (or professional investment management) services by

AFA paid different rates depending on the amount of assets in their accounts, as follows:

- Average balance of $100,000 or less:                     0.60% of assets;
- Average balance between $100,001 and $250,000:    0.45% of assets;
- Average balance exceeding $250,000:                       0.30% of assets.

*See* Am. Compl. at ¶ 146 (docket no. 29).

In asserting that these rates were unreasonably excessive, plaintiffs have supplied

information about other 401(k) plans that, during a particular year between 2019 and

2023, employed Edelman (not AFA) as a managed account service provider.  Plaintiffs

indicate that, unlike its competitors (namely, Morningstar, Inc. and Fidelity), Edelman

"provides the same core asset allocation services to all plans for which it acts as the

[managed account] service provider."  *Id.* at ¶ 141; *see also id.* at ¶ 142 (stating that

Edelman uses "the same key drivers of asset allocation risk level" for every plan, *i.e.*,

retirement age and risk preference, with the majority of participants using, respectively,

the default age (65) and a "typical" risk preference).  Plaintiffs have offered no

---

[19] In their operative pleading, plaintiffs cited to the Nordstrom Plan's disclosure statement dated October 2023.  *See* Am. Compl. at ¶ 146 (docket no. 29).  A copy of this document has been furnished by the Nordstrom Defendants, *see* Ex. 2F to Mandhania Decl. (docket no. 31), and because it was incorporated by reference, the Court has considered it.  *See Khoja*, 899 F.3d at 998 & 1002.

1   information concerning the professional investment management services that AFA

2   performs, and they do not allege that Edelman's practices, if any, as a sub-advisor are

3   similar to its methods as a managed account service provider.  Moreover, plaintiffs have

4   not explained the relationship between Edelman and the sub-advisor actually hired by

5   AFA (*i.e.*, FEA).  *See* Ex. 2F to Mandhania Decl. (docket no. 31 at 52); *see also*

6   https://www.edelmanfinancialengines.com/about-us/ (reflecting that Edelman Financial

7   Engines, LLC and FEA are related, but different, businesses).

8       The information furnished by plaintiffs about Edelman's clients is reproduced in

9   the following table:

| Plan Sponsor | Year | Participants[20] | Assets[20] | Edelman's Fee Rate |
|---|---|---|---|---|
| American Airlines, Inc. | 2021 | 103,773 | $13.5 billion | 0.185% |
| AT&T Inc. | 2023 | 242,239 | $44.8 billion | 0.155% |
| Bristol-Myers Squibb Company | 2023 | 26,306 | $8.5 billion | ≤ $10K: 0.00%<br>> $10K: 0.17% |
| Cisco Systems, Inc. | 2019 | 62,491 | $15.8 billion | ≤ $10K: 0.000%<br>> $10K: 0.195% |
| Dell Technologies Inc. | 2020 | 62,549 | $12.3 billion | ≤ $100K: 0.25%<br>≤ $250K: 0.20%<br>> $250K: 0.10% |
| Duke Energy Corporation | not provided | 36,599 | $9.7 billion | 0.195% |
| International Business Machines Corporation ("IBM") | 2020 | 169,033 | $56.8 billion | ≤ $375K: 0.17%<br>> $375K: 0.12% |

Am. Compl. at ¶¶ 150–51 (docket no. 29).

---

[20] Whether the number of participants and the amount of assets for each plan relate to the year for which plaintiffs stated Edelman's fee rates or reflect an average for the period from 2018 to 2023 is unclear; plaintiffs labeled their tables in two different ways.  *See* Am. Compl. at ¶¶ 151 & 153 (docket no. 29).

Rather than raising an inference of imprudence, this data and the other allegations set forth in the operative pleading plausibly suggest that (i) AFA charges more than Edelman for more and/or different work, and/or (ii) Edelman's clients pay lower rates because they have greater bargaining power than the Nordstrom Plan; the alleged comparators range from at least twice to over 15 times the size of the Nordstrom Plan. *See id.* at ¶¶ 116, 151, & 153 (showing either single-year or six-year-average amounts of assets for the Nordstrom Plan and the alleged comparators).  Plaintiffs have also failed to rule out dissimilarities between the various plans concerning the extent to which managed account services are used.  As the Nordstrom Defendants have aptly observed, *see* Defs.' Mot. at 23 (docket no. 30), the number of participants within a plan who seek or sign up for managed account services is an important factor when comparing rates or fees; if the demand for such service is low, then the cost per participant will be higher because, in such scenario, each participant who opts in must cover a consequently larger share of the vendor's fixed costs and targeted revenue.  Moreover, with one exception, the alleged comparators do not use a managed account fee system similar to the tiered-rate structure employed by the Nordstrom Plan, and thus, plaintiffs have not presented a like-for-like analysis.  *See Dionicio*, 2024 WL 1216519, at *5.  Finally, if Edelman is not even the sub-advisor hired by AFA, plaintiffs' attempted comparison is meaningless.

Because plaintiffs have failed to allege facts from which imprudence relating to managed account fees may be plausibly inferred, they have not stated a viable claim for relief.  Plaintiffs might, however, be able to cure the deficiencies of their current pleading, and thus, they will be given leave to amend.  *See Eminence Capital*, 316 F.3d at 1052.  With regard to plaintiffs' third and fourth claims against, respectively, the

1  Committee for breach of the duty of prudence, and Nordstrom and the Board for failure

2  to monitor, defendants' Rule 12(b)(6) motion is GRANTED, and those claims are

3  DISMISSED without prejudice.

4  **E.**    **Re-Allocation of Forfeited Employer Contributions**

5        As of January 1, 2021, any Eligible Employee of Nordstrom could participate in

6  the Nordstrom Plan "immediately upon his or her Employment Commencement Date"

7  with respect to both employee contributions[21] and Employer Matching Contributions.[22]

8  *See* 2021 Restatement at §§ 4.1.1 & 4.1.2 (docket no. 31 at 264); *see also id.* at §§ 2.8 &

9  2.11 (defining "Eligible Employee" and "Employment Commencement Date") (docket

10  no. 31 at 257–58).  Although participants are fully vested in their own (Elective Deferral,

11  Catch-up, and/or Roth, *see supra* note 21) contributions to the Plan, their interests in and

12  rights to Employer Matching Contributions, as well as any Profit Sharing Contributions,[23]

13  are linked to their years of service, the timeframe during which they worked for

14

15  _____

16  [21] Plan participants may make contributions by electing to defer a certain percentage of their
annual compensation; these amounts are called Elective Deferral Contributions.  *See* 2021
Restatement at §§ 4.1.1 & 5.2.1 (docket no. 31 at 264–65).  Participants who are or will be

17  age 50 by the end of the plan year may also make Catch-up Contributions, up to the limit
specified in the Internal Revenue Code.  *Id.* at § 5.2.3 (docket no. 31 at 269).  In addition,
participants may designate as Roth contributions a portion or all of their Elective Deferral

18  Contributions.  *Id.* at § 5.3.1 (docket no. 31 at 270).  Nordstrom matches Elective Deferral
Contributions, but not Catch-up Contributions.  *See id.* at § 5.4.1 (docket no. 31 at 271).

19
[22] Eligibility for Employer Matching Contributions is determined pursuant to the Plan document

20  in effect at the time employment by Nordstrom commenced.  *See* 2021 Restatement at §§ 4.1.2
& 5.4.2 (docket no. 31 at 264 & 271).  Thus, individuals who began working for Nordstrom

21  prior to January 1, 2021, might not have been eligible for Employer Matching Contributions
"immediately" on their Employment Commencement Date.

22  [23] On January 1, 2021, Nordstrom ceased making Profit Sharing Contributions, but in previous
years, Nordstrom could provide discretionary Profit Sharing Contributions to Plan participants.

23  *See* 2021 Restatement at § 5.1.1 (docket no. 31 at 265).

Nordstrom, and whether the Plan is considered "top heavy," meaning roughly that certain amounts relating to Key Employees constitute more than 60% of such sums for all employees. *See* 2021 Restatement at §§ 8.1.2 & 12.3.4 (docket no. 31 at 282–83 & 302); *see also id.* at § 12.3.2 (docket no. 31 at 301) (defining "Key Employee").

Forfeiture of a participant's rights to Employer Matching Contributions and/or Profit Sharing Contributions (collectively, "Nordstrom Contributions") may occur via severance in two ways:  (i) severance from employment (before completing the requisite years of service or qualifying for normal retirement) because of the participant's "fraud, embezzlement or dishonesty or any willful act which injures the Employer or the Employee's fellow workers," *id.* at § 8.2 (docket no. 31 at 284); and (ii) severance from employment before vesting in Nordstrom Contributions, *id.* at § 8.3 (docket no. 31 at 284–85).  In the former scenario (*i.e.*, severance for cause), the forfeiture of Nordstrom Contributions occurs immediately.  *Id.* at § 8.6 (docket no. 31 at 286).  With regard to the latter situation, the nonvested portion of the participant's account is forfeited upon the earlier of (a) the date when the entire vested part of the participant's account is distributed, or (b) the date when the participant completes five consecutive one-year Breaks in Vesting Service.  *See id.* at § 8.3 (docket no. 31 at 284–85); *see also id.* at § 2.3 (docket no. 31 at 256) (defining "Break in Vesting Service" to mean a year during which the participant has failed to complete more than 500 hours of service).  If, prior to the end of the aforementioned five-year period, the participant is re-employed by Nordstrom, then the amounts tentatively subject to forfeiture, and temporarily held in a "forfeiture suspense account," must be restored to the participant's account.  *Id.* at § 8.4 (docket no. 31 at 285).

Under the terms of the Nordstrom Plan, the "forfeiture suspense account" contains three types of funds, which are to be held until re-allocated: (i) Nordstrom Contributions that were forfeited pursuant to § 8.2 when the participant was terminated for cause ("§ 8.2 Funds"); (ii) nonvested Nordstrom Contributions that are pending forfeiture pursuant to § 8.3 as a result of a participant's severance from employment ("§ 8.3 Funds"); and (iii) unclaimed benefits forfeited pursuant to § 10.8 because the Plan's fiduciary does not know the whereabouts of the participants or beneficiaries to whom such funds are owed ("§ 10.8 Funds").[24]  *See id.* at § 6.5.1 (docket no. 31 at 277).  The Plan document requires that the "forfeiture suspense account" funds

> be used first to restore any previously forfeited amounts under Section 10.8.2, and then to reduce Company contributions as provided under Section 5.1.2.

*Id.* at § 6.5.3 (docket no. 31 at 277).  Section 5.1.2 provides:

> To the extent not used to restore amounts previously forfeited under Section 10.8.2, forfeitures under Section 8.3 for the then completed Plan Year *shall be used to reduce the Employer contribution obligations or to pay expenses of Plan administration, as determined by the Retirement Committee in its sole discretion*.

Am. Compl. at ¶ 170 (docket no. 29) (emphasis in original, quoting 2021 Restatement at § 5.1.2 (docket no. 31 at 265)).

---

[24] Section 10.8 requires the Plan's fiduciary to make reasonable efforts to locate participants or beneficiaries and notify them of vested balances, and then to hold unclaimed amounts in the "forfeiture suspense account" subject to restoration if the participants or beneficiaries are found and request payment.  2021 Restatement at §§ 10.8.1 & 10.8.2 (docket no. 31 at 296).

1.    **Duties of Loyalty and Prudence (and Derivative Failure to Monitor)**

Plaintiffs construe §§ 5.1.2 and 6.5.3 of the 2021 Restatement to confer on the Committee discretion to use funds in the "forfeiture suspense account" to either reduce Nordstrom's contributions to the Plan or pay administrative expenses.  *Id.* at ¶ 171. Based on this overly simplistic interpretation, plaintiffs allege that (i) the Committee's failure to use the money in the "forfeiture suspense account" to defray the Plan's administrative expenses constituted breaches of the Committee's duties of loyalty[25] and prudence, and (ii) Nordstrom and the Board failed to adequately monitor the Committee with respect to the use of forfeited funds.  Plaintiffs' assertions lack merit for at least three reasons.

First, the re-allocation of amounts in the "forfeiture suspense account" that are § 8.2 Funds or § 10.8 Funds is dictated by the Plan's terms, and such action is therefore taken in the capacity of a "settlor," not a fiduciary, of the Plan; an ERISA claim may be dismissed as a matter of law if the underlying allegations "do not implicate a fiduciary action."  *Dimou v. Thermo Fisher Sci. Inc.*, No. 23-CV-1732, 2024 WL 4508450, at \*7 (S.D. Cal. Sept. 19, 2024); *see also* *Naylor v. BAE Sys., Inc.*, No. 24-cv-536, 2024 WL 4112322 (E.D. Va. Sept. 5, 2024).  The Committee's discretion under § 5.1.2 is limited to § 8.3 Funds.  *See* 2021 Restatement at § 5.1.2 (docket no. 31 at 265) ("forfeitures *under Section 8.3* . . . shall be used . . . as determined by the Retirement Committee in its sole

---

[25] To prevail on a breach-of-loyalty claim, plaintiffs must establish that the Committee failed to act "solely in the interest of the [Plan's] participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan[.]"  *See* 29 U.S.C. § 1104(a)(1)(A).

1    discretion" (emphasis added)).  With regard to all other sums in the "forfeiture suspense

2    account," *i.e.*, § 8.2 Funds and § 10.8 Funds, the Plan document dictates that they be

3    applied first to restore vested benefits to participants or beneficiaries with whom contact

4    has been reestablished and then to reduce Nordstrom's contributions to the Plan.  *See id.*

5    at § 6.5.3 (docket no. 31 at 277).  In enumerating, in their operative pleading, the annual

6    amounts by which Nordstrom's contributions to the Plan were reduced via re-allocation

7    of "forfeiture suspense account" funds,[26] plaintiffs did not differentiate between § 8.2,

8    § 8.3, and § 10.8 Funds.  *See* Am. Compl. at ¶¶ 174–80 (docket no. 29).  Thus, plaintiffs

9    have challenged not just the exercise of the Committee's discretion but also the crafting

10    of the Plan's terms, which is a "settlor" function that cannot give rise to a breach-of-

11    fiduciary-duty claim under ERISA.  *See Naylor*, 2024 WL 4112322, at *7 (citing

12    *Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996)).

13        Second, plaintiffs' reading of the Plan document is incorrect as a matter of law.

14    Under plaintiffs' theory, funds in the "forfeiture suspense account" could never be used

15    to reduce Nordstrom's contributions to the Plan because doing so would constitute a

16    breach of fiduciary duty.  Plaintiffs' interpretation improperly renders a portion of § 6.5.3

17    superfluous.  The appropriate way to construe the 2021 Restatement is to give effect to

18    both § 6.5.3 and § 5.1.2, *see Liao v. Fisher Asset Mgmt., LLC*, No. 24-cv-2036, 2024 WL

19

20    ──────────────────────

21    [26] According to plaintiffs, Nordstrom's non-elective contributions were decreased in each of the
     six years between 2018 and 2023 by the following sums:

22

| 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|------|------|
| $1.4 million | $1.3 million | $1.4 million | $3.7 million | $7.2 million | $8.5 million |

23    Am. Compl. at ¶¶ 174–79 (docket no. 29).

4351869, at *4 (N.D. Cal. Sept. 30, 2024) (indicating that no provision of an ERISA plan should be "rendered nugatory"), meaning that sums in the "forfeiture suspense account" are applied first to restore benefits pursuant to § 10.8.2, then to reduce Nordstrom's contributions to the Plan, and finally, to the extent any surplus is coextensive with remaining § 8.3 Funds, to pay the Plan's administrative expenses.  *See* *Naylor*, 2024 WL 4112322, at *6 (indicating that the terms of the plan at issue "can only be reasonably read to confer discretion in those situations where such forfeitures are not needed to satisfy their required, mandatory use . . . , as any other reading essentially nullifies these mandatory-use provisions").  Plaintiffs contend that such interpretation makes § 5.1.2 meaningless, *see* Am. Compl. at ¶ 172 (docket no. 29), but plaintiffs' argument presupposes that the amounts in the "forfeiture suspense account" will never exceed the aggregate of benefits to be restored pursuant to § 10.8.2 and Nordstrom's required contributions to the Plan; such speculation does not justify disregarding the plain language of § 6.5.3.  *See* *Naylor*, 2024 WL 4112322, at *6 (observing that, "while the circumstances under which such discretion could be exercised appear limited," they are not impossible, "such as where the Employer suspends its contributions for financial reasons").

Third, as other district courts faced with similar claims have concluded, the premise underlying plaintiffs' forfeiture-related causes of action is implausible.  *See* *Hutchins v. HP Inc. ("Hutchins I")*, 737 F. Supp. 3d 851, 862 (N.D. Cal. 2024); *see also* *Dimou*, 2024 WL 4508450, at *8–9.  Plaintiffs' proposition, namely that re-allocating "forfeiture suspense account" funds to reduce Nordstrom's contributions was *per se* imprudent, runs contrary to the principle that "the content of the duty of prudence turns

1  on 'the circumstances . . . prevailing' at the time the fiduciary acts" and "the appropriate

2  inquiry will necessarily be context specific."  *See* *Hutchins I*, 737 F. Supp. 3d at 862

3  (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (citing 29

4  U.S.C. § 1104(a)(1)(B))).  Plaintiffs' contention allows for no set of circumstances and

5  no context in which a prudent and loyal course of action would be to apply amounts in

6  the "forfeiture suspense account" toward the matching contributions due from

7  Nordstrom.  In *Hutchins I*, this type of claim was characterized as a "swing for the

8  fences," *see id.* at 856, and it was eventually dismissed with prejudice as implausible in

9  light of the 401(k) industry's "long history of using forfeitures to reduce employer

10 contributions," *see* *Hutchins v. HP Inc. ("Hutchins II")*, 767 F. Supp. 3d 921, 923

11 (N.D. Cal. Feb. 5, 2025), *appeal docketed*, No. 25-826 (9th Cir. Feb. 7, 2025).

12        As observed in both *Hutchins I* and *Hutchins II*, in February 2023, the IRS

13 proposed a regulation that would require qualified defined-contribution plans in which

14 forfeitures may occur to provide that the forfeited funds will be used for specifically

15 enumerated purposes, one of which could be "to reduce employer contributions under the

16 plan."  *See* *Hutchins I*, 737 F. Supp. 3d at 863; *see also* *Hutchins II*, 767 F. Supp. 3d at

17 923 (quoting Use of Forfeitures in Qualified Retirement Plans, 88 Fed. Reg. 12282-01,

18 12285 (Feb. 27, 2023) (proposing amendments to 26 C.F.R. § 1.401-7)).[27]  In its notice of

19 rulemaking, the IRS discussed a Conference Report in which Congress was advised,

20 when enacting the Tax Reform Act of 1986 ("TRA 86"), that, following the changes

21

22 [27] The changes to 26 C.F.R. § 1.401-7 have not yet been implemented, and the Court has not
   considered for substantive purposes the language of the regulation itself, but rather, solely the
23 historical context in which it was proposed.

effectuated by TRA 86, "forfeitures arising in any defined contribution plan . . . can be either (1) reallocated to the accounts of other participants in a nondiscriminatory fashion, or (2) used to reduce future employer contributions or administrative costs."  88 Fed. Reg. at 12283 (quoting H.R. Rep. No. 99-841, at II-442 (1986)).  In light of the almost 40-year-old public document referenced by the IRS, plaintiffs must, to state a plausible claim of imprudence and/or disloyalty, plead something more than an ordinary use of forfeited funds to pay future employer contributions, or in other words, behavior that is not consistent with the practices of perhaps all 401(k) plan fiduciaries.

For example, in one of two cases on which plaintiffs rely, _Rodriguez v. Intuit Inc._, 744 F. Supp. 3d 935 (N.D. Cal. 2024),[28] the plaintiff alleged that the terms of the plan-in-

---

[28] The other case cited by plaintiffs, _Perez-Cruet v. Qualcomm Inc._, No. 23-cv-1890, 2024 WL 2702207 (S.D. Cal. May 24, 2024), is unpersuasive.  First, unlike the Nordstrom Plan, the plan at issue in _Perez-Cruet_ expressly allowed the managers of the plan to elect, without any restriction, whether to pay administrative expenses or reduce contributions using forfeited nonvested assets. _Id._ at *1 (observing that, "[a]lthough under the terms of the Plan, Defendants could have used the forfeited contributions to defray . . . administrative expenses . . . , the Defendants did not make that choice").  For this same reason, the _Naylor_ Court also recognized that _Perez-Cruet_ was not analogous.  _See_ 2024 WL 4112322, at *6 n.8.  Second, as observed by the Northern District of California, _see Hutchins I_, 737 F. Supp. 3d at 862 n.1, the analysis in _Perez-Cruet_ is conclusory.  The _Perez-Cruet_ Court reasoned that the plaintiff had pleaded plausible breach-of-fiduciary-duty claims by alleging administrative expenses "could have been reduced to zero" through the use of forfeited funds.  _See_ 2024 WL 2702207, at *2–3.  Using this _ipso facto_ logic, the _Perez-Cruet_ Court did not, as it acknowledged it must, divide the "plausible sheep" from the "meritless goats."  _See id._ at *2 (quoting _Dudenhoeffer_, 573 U.S. at 425).  Instead, the _Perez-Cruet_ Court substituted the plaintiff's injury (_i.e._, incurring more than "zero" in administrative expenses) for the theory of liability and supporting factual allegations necessary to identify "plausible sheep."  Finally, in focusing on the plaintiff's alleged damages, the _Perez-Cruet_ Court ignored the Ninth Circuit's admonition that ERISA § 404, concerning how a fiduciary shall conduct itself, "creates no exclusive duty of maximizing pecuniary benefits."  _See Foltz v. U.S. News & World Report, Inc._, 865 F.2d 364, 373 (9th Cir. 1989) (interpreting 29 U.S.C. § 1104(a)(1)); _Hutchins I_, 737 F. Supp. 3d at 863 ("it is neither disloyal nor imprudent under ERISA to fail to maximize pecuniary benefits"); _see also Dimou_, 2024 WL 4508450, at *9 (ERISA's "fiduciary duty provisions do not create an unqualified duty to pay administrative expenses, especially when the plan document does not create an entitlement to such benefits").

suit authorized the use of forfeitures for only Safe Harbor Matching Contributions, but the contributions for which forfeited funds were used during the years at issue were not, by definition, Safe Harbor Matching Contributions.  _Id._ at 944; _see id._ at 941 (indicating that the plan-in-suit provided "[a]ny amounts forfeited . . . shall be applied, at the Company's election, to: (i) pay expenses of administering the Plan; [and] (ii) . . . reduce the Participating Employers' obligation to make Safe Harbor Matching Contributions"). The plaintiff in _Rodriguez_ further asserted that, not only did her employer ignore the terms of the plan document at issue, it also failed to engage in "a 'reasoned and impartial decision-making process' considering 'all relevant factors' before determining how to use the forfeited funds."  _Id._ at 945.  The _Rodriguez_ Court concluded that the plaintiff had pleaded specific facts stating a plausible claim, which distinguished her from the _Hutchins_ plaintiff, who had "opened with a swing for the fences."  _See id._ at 945 & n.3.

        In contrast, in this case, plaintiffs have employed the "swing for the fences" approach, and they have not sought another "at bat" or offered any basis for believing that, if they saw another pitch, they could make contact with the ball.  Because the deficiencies of plaintiffs' disloyalty and imprudence claims concerning the allocation of forfeited funds, and of their derivative claim for failure to monitor, relate to plaintiffs' misinterpretation of the Plan's terms and their reliance on an incognizable theory of liability, the Court is persuaded that amendment would be futile and that leave to amend need not be given.  _See Eminence Capital_, 316 F.3d at 1052 (citing _Foman v. Davis_, 371 U.S. 178, 182 (1962) (recognizing as possible reasons for refusing leave to amend: (i) undue delay, bad faith, or dilatory motive on the pleading party's part; (ii) repeated failure to cure a pleading; (iii) undue prejudice to the opposing party; or (iv) _futility_)).

With regard to plaintiffs' fifth and sixth claims for breach of the Committee's duties of loyalty and prudence, respectively, as well as the derivative portion of plaintiffs' eighth claim against Nordstrom and the Board for failure to monitor the Committee, the Nordstrom Defendants' Rule 12(b)(6) motion is GRANTED, and those claims are DISMISSED with prejudice.

### 2.    <u>Self-Dealing</u>

In connection with the use of funds in the "forfeiture suspense account" to reduce Nordstrom's future contributions, plaintiffs also assert that the Committee violated § 406 of ERISA, which provides in relevant part:

> A fiduciary with respect to a plan shall not--
>
> > (1) deal with the assets of the plan in his own interest or for his own account . . . .

Pub. L. No. 93-406, § 406(b), 88 Stat. 829, 879 (1974) (codified as 29 U.S.C. § 1106(b)). Plaintiffs' claim is not cognizable. In two different cases, the Northern District of California has rejected claims of self-dealing relating to forfeited 401(k) funds. <u>See</u> <u>Hutchins II</u>, 767 F. Supp. 3d at 928–29; <u>Liao</u>, 2024 WL 4351869, at *5–6. Importantly, in <u>Hutchins II</u>, the amounts at issue were applied, as in this case, toward the employer's contributions, but in <u>Liao</u>, they were used to defray the Plan's expenses, and in both circumstances, the reasoning was the same, namely that the re-allocation of forfeited nonvested funds does not constitute a "transaction" governed by ERISA § 406(b)(1). <u>See</u> <u>Hutchins II</u>, 767 F. Supp. 3d at 928–29 (citing <u>Lockheed Corp. v. Spink</u>, 517 U.S. 882 (1996), and <u>Wright v. Or. Metallurgical Corp.</u>, 360 F.3d 1090 (9th Cir. 2004)); <u>Liao</u>, 2024 WL 4351869, at *5–6 (same). In <u>Wright</u>, the Ninth Circuit interpreted the Supreme

1    Court's decision in _Spink_ as construing ERISA § 406(b)(1) to prohibit fiduciaries from

2    engaging in certain types of transactions that are "likely to injure" the ERISA plan.

3    _Wright_, 360 F.3d at 1100–01 (quoting _Spink_, 517 U.S. at 888).  When, as here, the

4    forfeited funds have not been withdrawn from the Plan, but rather redistributed among

5    participants' accounts, the type of self-dealing transaction that animated the enactment of

6    ERISA § 406(b)(1) is not present.  Indeed, plaintiffs' contention that the forfeited

7    amounts should have been removed from the Plan's assets to pay third parties raises more

8    concern about potential injury to the Plan than the conduct challenged by plaintiffs.

9    Because the problem with plaintiffs' operative pleading that is identified in this

10   subsection is legal, and not factual, in nature, the Court concludes that amendment would

11   be futile.  Thus, the Nordstrom Defendants' related Rule 12(b)(6) motion is GRANTED,

12   and plaintiffs' seventh claim, which was brought pursuant to ERISA § 406(b)(1), and the

13   related portion of plaintiffs' derivative claim for failure to monitor, as outlined in their

14   eighth claim, are DISMISSED with prejudice.

15   **Conclusion**

16          For the foregoing reasons, the Court ORDERS:

17          (1)    The Nordstrom Defendants' motion for judicial notice or incorporation by

18   reference, docket no. 32, is GRANTED, and the Court has considered Exhibit 7 to the

19   Declaration of Ankur Mandhania, docket no. 23-9, as well as Exhibits 1 through 11 to the

20   Declaration of Ankur Mandhania, docket no. 31;

21          (2)    The Nordstrom Defendants' motion to dismiss, docket no. 30, is

22   GRANTED, and plaintiffs' Amended Complaint, docket no. 29, is DISMISSED, without

23

prejudice as to the first, second, third, and fourth claims, and with prejudice as to the fifth, sixth, seventh, and eighth claims;

(3)    Any second amended pleading shall be electronically filed within twenty-one (21) days of the date of this Order, and any responsive pleading or motion shall be due as indicated in Federal Rule of Civil Procedure 15(a)(3);

(4)    The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 23rd day of June, 2025.

Thomas S. Zilly
United States District Judge

ORDER - 43